# Illinois Official Reports

## Appellate Court

---

**Midwest Palliative Hospice & Care Center v. Beard, 2019 IL App (1st) 181321**

---

| | |
|---|---|
| Appellate Court Caption | MIDWEST PALLIATIVE HOSPICE AND CARE CENTER, Plaintiff-Appellant, v. CONSTANCE BEARD, as Director of Revenue, and THE ILLINOIS DEPARTMENT OF REVENUE, Defendants-Appellees. |
| District & No. | First District, First Division<br>Docket No. 1-18-1321 |
| Filed | February 25, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-L-50714; the Hon. Daniel J. Kubasiak, Judge, presiding. |
| Judgment | Circuit court judgment affirmed. Department of Revenue determination affirmed. |
| Counsel on Appeal | Michael J. Wynne, Jennifer C. Waryjas, and Douglas A. Wick, of Jones Day, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Carl J. Elitz, Assistant Attorney General, of counsel), for appellees. |

JUSTICE GRIFFIN delivered the judgment of the court, with opinion. Justices Pierce and Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     This case concerns the property tax status of an inpatient hospice care center. The hospice care center filed an application for tax-exempt status on the basis that it is a charitable institution. The Illinois Department of Revenue denied a property tax exemption to the care center, finding that it failed to meet its burden to demonstrate by clear and convincing evidence that the property was being put to an exclusively charitable use. The hospice care center filed a complaint for administrative review. On administrative review, the circuit court affirmed the Department of Revenue's determination. The care center appeals, and we affirm the circuit court's judgment and affirm the Department of Revenue's decision to deny the application for an exemption.

¶ 2                                    I. BACKGROUND

¶ 3     Plaintiff Midwest Palliative Hospice and Care Center (Midwest) operates a large end-of-life care facility in Glenview, Illinois. In 2008, Midwest operated a palliative care center on a 4.1-acre parcel of property in order to provide palliative care for patients and provide services to their families. The property was designated as tax exempt after the Department of Revenue entered into an agreement with Midwest granting it a 91.9% charitable property tax exemption for the property.

¶ 4     In 2011, Midwest began the construction of an inpatient hospice center pavilion on the same property as the palliative care center. Midwest previously offered in-home hospice care but sought to offer inpatient care because, among other reasons, it saw a need for providing end-of-life care for patients who could not be adequately cared for in their homes. In the hospice care pavilion, Midwest provides terminally ill patients with the interconnected network of professionals needed to provide proper end-of-life care.

¶ 5     Midwest filed an application for a charitable property tax exemption for the 2013 tax year for the property that houses both the palliative care center and the hospice care pavilion. The defendant in this case, the Department of Revenue, found that, while the palliative care center remained property-tax exempt, the hospice care pavilion was not. Accordingly, the Department of Revenue denied Midwest's application for a charitable property tax exemption. The matter proceeded to an administrative hearing.

¶ 6     At the administrative hearing before the Department of Revenue, Midwest produced evidence about its endeavors with the aim of convincing the administrative law judge that it was entitled to a charitable property tax exemption. The parties entered into certain stipulations and, according to the administrative law judge, "the only issue [was] whether the Pavilion was used for charitable purposes in 2013." Several witnesses testified at the hearing and exhibits were introduced about Midwest's mission and its financial and operational endeavors.

¶ 7     For income tax purposes, Midwest is classified as a 501(c)(3) organization (26 U.S.C. § 501(c)(3) (2012)). Midwest's bylaws provide that its purposes are "exclusively charitable," and its articles of incorporation provide that its earnings cannot benefit any person. The articles

of incorporation further provide that Midwest cannot discriminate against protected classes in conducting its operations and that it must admit patients that meet the applicable admission criteria without regard to the prospective patient's ability to pay, meaning that it does not turn away patients that lack insurance or government program coverage.

¶ 8    As part of its mission, Midwest provides adult bereavement services, counseling and support services to children, and a camp for grieving children and teenagers. Midwest trains volunteers to provide vigil support and companionship to families and patients, and its volunteers provide comfort services and goods for suffering patients. Midwest also trains medical students, free of charge, in providing hospice services, which it claims helps to supply appropriately trained physicians for palliative and hospice patients in the Chicagoland area.

¶ 9    To further its position that the hospice pavilion should be a property-tax-exempt charitable institution, Midwest pointed out at the administrative hearing that its hospice care pavilion is on the same plot of land as the tax-exempt palliative care center, is owned by the same entity, and operates under the same charitable principles. The patient population is essentially the same with the only real difference between the two divisions being that the care is delivered at a different space on the property depending on the phase of care called for by the patient's status. The intake procedures and financial operations of the two divisions are the same.

¶ 10   In a 32-page recommendation, the administrative law judge explained his conclusion that "Midwest has not demonstrated, by the presentation of testimony or through exhibits and argument, sufficient evidence to warrant an exemption of the Marshak pavilion from 2013 real estate taxes." The administrative law judge examined the guidelines that are generally used in Illinois to determine whether the "exclusive charitable use" exemption applies (see generally *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149 (1968)) and found that Midwest had not demonstrated an entitlement to the tax exemption. The administrative law judge's recommendation was adopted by the Department of Revenue. Midwest filed for administrative review in the circuit court, and the circuit court affirmed the Department of Revenue's decision. Midwest now appeals to this court.

¶ 11                                 II. ANALYSIS

¶ 12   The issue in the case is whether Midwest qualifies for a property tax exemption. Resolving the exemption issue in this case requires a consideration of the Illinois Constitution, the Property Tax Code, and Illinois Supreme Court case law. An entity that seeks a charitable property tax exemption must demonstrate that its property is both owned by a charitable institution and put to an exclusively charitable use. In this case, there is no dispute that Midwest is a charitable institution; the question is whether the property at issue, the hospice care pavilion, was being used for a charitable purpose in 2013.

¶ 13   Under article IX of the Illinois Constitution, all real property is subject to taxation. *Eden Retirement Center, Inc. v. Department of Revenue*, 213 Ill. 2d 273, 285 (2004). Property taxes accrue on all property unless the particular property is exempted from taxation by the legislature. *Id.* The Illinois Constitution sets forth the criteria under which the General Assembly is permitted to grant property tax exemptions. "The General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes." Ill. Const. 1970, art. IX, § 6. Thus, the General Assembly is limited by the constitution in its power to grant property tax exemptions,

and when a party seeks a charitable use exemption, the property must be "used exclusively for *** charitable purposes." *Id.*; *Comprehensive Training & Development Corp. v. County of Jackson*, 261 Ill. App. 3d 37, 39-40 (1994).

¶ 14　In the Property Tax Code (35 ILCS 200/1-1 *et seq.* (West 2016)), the General Assembly has granted a property tax exemption to properties that are used for charitable purposes. *Id.* § 15-65. The Property Tax Code exempts property from taxation when the property is "actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit." *Id.* The charitable exemption applies to property used by nonprofit health care providers so long as the property is used for charitable purposes in accordance with the Property Tax Code. See *Oswald v. Hamer*, 2018 IL 122203, ¶ 4; 35 ILCS 200/15-86 (West 2016).

¶ 15　In *Korzen*, 39 Ill. 2d at 156-57, the Illinois Supreme Court set forth what has become the accepted framework for deciding whether property can be considered to be used exclusively for charitable purposes and therefore exempt from taxation under section 15-65 of the Property Tax Code. In *Korzen*, the supreme court identified the distinctive characteristics of a charitable institution, and Illinois courts have used those criteria as a guide to determine whether a piece of property and the party seeking the property tax exemption meet the statutory requirements to be entitled to the exemption.

> "(1) [The organization] is set up for the benefit of an indeterminate number of persons; (2) it has no capital, capital stock or shareholders and earns no profits or dividends; (3) it derives its funds primarily from public and private charity and holds those funds in trust for the objectives and purposes expressed in its charter; (4) it dispenses charity to all who need and apply for it, does not provide gain or profit in a private sense to any person connected with it, and does not appear to place obstacles of any character in the way of those who need and would avail themselves of the charitable benefits it dispenses; (5) the property is actually and factually used exclusively for the charitable purpose, regardless of any intent expressed in the organization's charter or bylaws; and (6) charity use is the primary purpose for which the property is used and not a secondary or incidental purpose." *Riverside Medical Center v. Department of Revenue*, 342 Ill. App. 3d 603, 607 (2003) (citing *Korzen*, 39 Ill. 2d at 156-157).

¶ 16　There is some dispute between the parties regarding what standard of review we should apply. The matter arises out of an administrative proceeding and is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)). Generally, when an administrative agency's decision involves a pure question of law, we review it *de novo. Skokie Firefighters Union, Local 3033 v. Illinois Labor Relations Board, State Panel*, 2016 IL App (1st) 152478, ¶ 11. When reviewing purely factual findings, the agency's findings and conclusions are deemed to be *prima facie* true and correct and, thus, are reviewed under a manifest weight of the evidence standard. *Id.*; see also 735 ILCS 5/3-110 (West 2016). When an agency's decision presents a mixed question of law and fact, it will be overturned on appeal only if it is clearly erroneous. *Village of North Riverside v. Boron*, 2016 IL App (1st) 152687, ¶ 14.

¶ 17　Here, as even Midwest tacitly acknowledges, we are presented with a situation where the administrative law judge was required to apply the law to a given set of facts. Midwest, however, attempts to characterize its challenge to the administrative proceedings as a challenge to the administrative law judge's interpretation of statutory provisions with a

stipulated record and undisputed facts. Midwest also argues that the matter does not invoke any expertise on the part of the Department of Revenue that would justify affording it any deference. Midwest, therefore, advocates for *de novo* review.

¶ 18    We reject Midwest's characterization of the proceedings below. The issue before the Department of Revenue was whether Midwest met its burden to demonstrate that it used the hospice care pavilion exclusively for charitable purposes in 2013. That is the same issue presented on appeal. We disagree with Midwest's characterization of the issue as purely a legal one. The case involves reviewing the parties' submissions, assessing the import of the facts submitted, putting the facts through a multipart legal test, and deciding a fact-intensive question—whether the property is being used for charitable purposes and whether such use is exclusive.

¶ 19    The administrative law judge was tasked with making a decision that turns on facts: whether this particular institution and this particular property have the requisite factual basis to qualify for a statutory property tax exemption. The legal precepts must then be applied to the facts established at the administrative hearing, so we review the Department of Revenue's decision to deny a property tax exemption under the clearly erroneous standard. Whether property is being used for an exclusively charitable purpose is a mixed question of law and fact. *Meridian Village Ass'n v. Hamer*, 2014 IL App (5th) 130078, ¶ 2. We review the Department of Revenue's decision to deny a charitable property tax exemption under the clearly erroneous standard. *Three Angels Broadcasting Network, Inc. v. Department of Revenue*, 381 Ill. App. 3d 679, 693 (2008).

¶ 20    To make its decision, the Department of Revenue, through its administrative law judge (ALJ), assessed the *Korzen* factors to make a determination on whether the property was entitled to a charitable property tax exemption. Although the ALJ found that certain of the *Korzen* considerations tended to show that Midwest was operating as a charitable institution, other factors showed much more clearly that it was being run as a business enterprise, not a charity.

¶ 21    Midwest argues that the ALJ's analysis is misguided in that it should have only analyzed the sixth *Korzen* factor—charitable use—because the parties stipulated that the hospice care pavilion was owned by a charitable institution. Relying on *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 390 (2010) (superseded by statute), Midwest posits that the first five *Korzen* factors concern only whether the property is owned by a charitable institution. Thus, Midwest argues, those first five *Korzen* factors were taken out of dispute when the parties agreed that Midwest is owned by a charitable institution and should not have been considered by the ALJ.

¶ 22    We find Midwest's argument on this point to be unpersuasive. While it is true that the ALJ was tasked with only determining whether the property was being put to a charitable use, it does not mean that the first five *Korzen* factors cannot be considered insofar as they relate to how the property is being used. See *Eden*, 213 Ill. 2d at 294 (affirming an ALJ's determination on the question of charitable use where the ALJ considered all *Korzen* factors to inform the decision on charitable use). Even if the ALJ was not required to analyze all of the *Korzen* factors, it is clear that his decision came down to whether the property was being put to a charitable use—the exact question Midwest claims he was called upon to answer.

¶ 23    Moving to the merits of the ultimate issue in this case, we are called to review whether the Department of Revenue, through its ALJ, clearly erred when it found that Midwest failed to

demonstrate that the hospice care pavilion was being used exclusively for charitable purposes in 2013. When applying for a property tax exemption, the burden is on the party seeking the exemption to demonstrate by clear and convincing evidence that the property is being used for exclusively charitable purposes. *LeaderTreks, Inc. v. Department of Revenue*, 385 Ill. App. 3d 442, 451 (2008). When determining whether property is within the scope of an exemption, all facts are to be construed, and all debatable questions are to be resolved, in favor of taxation. *Id.* at 451-52.

¶ 24 In reviewing the financial data submitted, the ALJ observed that 0.4% of Midwest's operating revenue came from charitable contributions. The overwhelming majority of its operating revenue came from "net patient services," of which 88% of the revenue came from Medicare or Medicaid reimbursement. The ALJ took note that 94% of the revenue Midwest generated was from billing patients: exchanging medical services for payment, as a business. The ALJ explained that, in 2013, Midwest was "not devoting a substantial portion of its operating income to an identifiable charitable need" and, thus, he was "unable to conclude that the revenue received by Midwest is devoted to the general purpose of charity."

¶ 25 As for serving the public in a charitable manner, the ALJ was not persuaded. It was the ALJ's belief that "the evidence shows conclusively that the benefits derived from Midwest, providing palliative and hospice care services, are derived by patients with the means to pay for the services." The ALJ observed that nearly all of Midwest's operating revenue was earned from patient care, and he extrapolated that its primary purpose was not to provide charity but to serve paying customers. Similarly, the ALJ did not find that Midwest reduced the burdens on the government as many charitable endeavors do. Instead, the trial court noted that 88% of Midwest's revenue was coming from government programs: not relieving the government of any burdens but receiving payment from the government in exchange for providing its services. According to the ALJ, Midwest is not giving something of value for free by providing services gratuitously to the public. It is being paid.

¶ 26 While the ALJ took note of the community-based benefits Midwest offers, like bereavement counseling and training medical students, it did not find the activities to be "charitable acts sufficient to justify a property tax exemption." Instead, the ALJ opined that many of the "community benefits" actually served to benefit Midwest as a business, not as a charity. Midwest submitted a financial statement stating that it provided charity care to patients worth approximately $157,000 in 2013. However, the ALJ discounted that evidence to some degree, noting that it was "possibly overstated" and unsupported by documentary evidence. The ALJ stated that there was no specific testimony introduced at the hearing regarding either the number of patients receiving charity care or the dollar amount of Midwest's charitable expenditures for the 2013 exemption year.

¶ 27 The ALJ also observed that, even if Midwest provided $157,000 in charitable care in 2013, its charitable expenditures would still represent less than 1% of the net services revenue of $30 million it generated that year. And even if Midwest provided charitable services to 37 of its hospice patients, its charitable services were still only rendered for 8% of the 470 hospice patients it served that year. The ALJ found that, because "the disparity between the dollar amount of Midwest's charity care and its 'net patient service revenue' is so extreme [it] would not be reasonable to conclude that the primary use of this property is to provide charity." The ALJ concluded that the less than 1% expenditure for charitable care on the property

"represents an incidental act of beneficence that is legally insufficient to establish that Midwest 'exclusively' uses the Marshak Pavilion for charitable purposes."

¶ 28    We conclude that the Department of Revenue did not clearly err when it found that Midwest failed to meet its burden to demonstrate by clear and convincing evidence that its hospice pavilion was used exclusively for charitable purposes in 2013. Midwest maintains that the hospice care pavilion "provided massive community benefits, raised large sums of charitable contributions, and is indisputably run as a non-profit." However, the evidence introduced at the administrative hearing showed that almost none of Midwest's revenue comes from charitable contributions, and almost none of the revenue Midwest generated was expended on providing charitable services.

¶ 29    Instead, Midwest generates revenue almost exclusively by performing services to patients for pay. The revenue that Midwest generates gives it the opportunity to offer more services and do more good deeds. Midwest made out the case that it is a noble institution. But just because an institution is a nonprofit and performs good deeds does not mean that the institution is using its real property exclusively for charitable purposes as that term is used in the Illinois Constitution.

¶ 30    Midwest argues that the ALJ's analysis was flawed in that it focused so heavily on the finding that, even if Midwest provided $157,000 in charitable care in 2013, its charitable expenditures were still less than 1% of the net services revenue of $30 million that it generated. Midwest argues that we should reject a quantitative test for determining the charitable use of property. See 35 ILCS 200/15-86(a)(1) (West 2016). The quantitative analysis employed by the ALJ was just one part of his inquiry into whether the property was being used for a charitable purpose. It is true that the use of revenue should not be the sole focus; "[t]he critical issue is the use to which the property itself is devoted." *Provena*, 236 Ill. 2d at 403. The way the revenue is used, however, is significant in informing about the way the property itself is being used.

¶ 31    Just because an institution offering medical services is *willing* to provide charitable care, it does not mean that the institution's exclusive purpose was, *in fact*, to provide charity in a given year. The ALJ observed that the evidence introduced by Midwest did not show that it was primarily devoted to dispensing charity at its hospice care pavilion. In fact, the correspondence between Midwest and its patients regarding the small amount of fees that Midwest did agree to waive in 2013 showed that it ordinarily expects to be fully compensated for its services. There was nothing identified at the administrative hearing that could suggest that the hospice care pavilion was being run primarily as a gift to the public. See *Provena Covenant Medical Center v. Department of Revenue*, 384 Ill. App. 3d 734, 744 (2008). Even the fact that Midwest used *some* of its revenue for providing gratuitous services does not mean that the property was being used exclusively or primarily for such a purpose in 2013. See *People ex rel. Nordlund v. Association of the Winnebago Home for the Aged*, 40 Ill. 2d 91, 102 (1968).

¶ 32    The evidence in this case showed that Midwest almost exclusively served people that did not need charitable care. Midwest points out that the majority of the prospective patients for hospice care are people of advanced age that will have some type of insurance or government program assistance to help pay for their care. Midwest contends that it should not be deemed to be any less charitable on the basis that most of its patients can pay in some form. This observation is well taken, but it does not advance Midwest's position that it is using the hospice care pavilion exclusively for charitable purposes. See *Eden*, 213 Ill. 2d at 294; *Alivio*

*Medical Center v. Department of Revenue*, 299 Ill. App. 3d 647, 651 (1998). The Department of Revenue is not required to find that an entity that receives the maximum amount that Medicare or Medicaid will pay for its services is serving the public altruistically such that it is entitled to pay no property taxes. There is nothing wrong with Midwest being able to receive payment for its services. The fact that most of its patients can pay just puts Midwest in line with other medical service businesses—purveyors of medical services for remuneration.

¶ 33    Midwest relies heavily on the fact that the palliative care center was determined to be tax exempt as supportive of its position that the hospice care pavilion should be tax exempt too. Midwest argues that the Department of Revenue's decision is inconsistent and therefore cannot withstand review. Midwest points to the fact that the hospice care pavilion operates under the same operational and financial policies as the palliative care center. According to Midwest, the two divisions are essentially operated as one enterprise. The hospice care pavilion, like its palliative care center, accepts patients on a nondiscriminatory basis. It has the same intake procedures and the same mission. It has the same patient population. It even shares the same property identification number as the tax-exempt palliative care center. Midwest argues that there is no reason for treating the two divisions differently for purposes of property taxes.

¶ 34    But Midwest also acknowledges that the two divisions are, in fact, separate. They can be treated differently for tax purposes, as each entity seeking a tax exemption must carry its burden to demonstrate its entitlement to an exemption. See *Provena*, 236 Ill. 2d at 388 (plaintiff was required to demonstrate an exclusive charitable use of the Provena Covenant Medical Center complex itself). While the Department of Revenue entered into a settlement agreement with the palliative care center, stipulating to its charitable status, there was nothing binding the Department of Revenue to treat the hospice care pavilion in the same manner. In fact, in the 2008 settlement agreement between Midwest and the Department of Revenue regarding the palliative care center's tax status, the parties agreed that "Midwest is not precluded from seeking exemption for the Marshak Family Hospice Pavilion in subsequent years." They also agreed that the stipulation as to the palliative care center's charitable status "shall not be used as evidence of charitable status or relied upon in any manner to prove charitable status in any other proceedings for subsequent tax periods." It is clear that the Department of Revenue, as was its prerogative, did not give much weight to the tax status of the palliative care center when deciding whether the separate division, the hospice care pavilion, qualified for a tax exemption. See *id.* at 388-89.

¶ 35    Although seemingly not raised before the Department of Revenue during the administrative hearing, Midwest argued in a posthearing brief and argues here that the hospice care pavilion might qualify for a charitable tax exemption on the basis that it is an extension of the tax-exempt palliative care center. We have previously found that certain entities separate but associated with a tax-exempt entity may enjoy the tax-exempt status of the other as a result of being "reasonably necessary" to carrying out the associated entity's charitable purpose. Separate entities like a parking lot (*Northwestern Memorial Foundation v. Johnson*, 141 Ill. App. 3d 309, 313 (1986)), a daycare center (*Memorial Child Care v. Department of Revenue*, 238 Ill. App. 3d 985, 986 (1992)), or even a vacant lot (*Norwegian American Hospital, Inc. v. Department of Revenue*, 210 Ill. App. 3d 318, 322 (1991)) might meet the criteria for a charitable use property tax exemption when they are reasonably necessary to further an associated entity's charitable mission.

¶ 36    In denying the relief requested in the post-hearing brief, the ALJ found that the "reasonably necessary" argument was insufficiently developed and that "[t]here was little evidence at the hearing as to what activities occur in the Care Center and there was even less evidence offered as to how the activities in the [hospice care pavilion] are reasonably necessary to fulfill the Care Center's mission." Here, Midwest argues that its pavilion has a stronger case for a tax exemption than a parking lot or a daycare center because the hospice care pavilion is attached to the palliative care center, actually provides charitable care itself, and, thus, is "reasonably necessary to execute the mission of the tax-exempt Palliative Care Center."

¶ 37    Midwest failed to meet its burden to demonstrate that the hospice care pavilion is reasonably necessary for carrying out the mission of the palliative care center. All along, Midwest has urged the Department of Revenue to find that the hospice care center is used for charitable purposes in its own right. While Midwest produced evidence tending to show that the hospice care pavilion was helpful in carrying out Midwest's overall mission, it never proved that the hospice care center was reasonably necessary for such a purpose in 2013. Midwest also agreed that it would not use the stipulated 2008 tax-exempt status of the palliative care center in its effort to seek further tax exemptions. It cannot now seek to piggyback an exemption for the hospice care pavilion onto its exemption for the palliative care center after it failed to meet its burden for an exemption for the hospice care pavilion in its own right.

¶ 38    The ALJ concluded that Midwest is run more as a business than a charity. It does good deeds for its patients and the community, to be sure, but it is paid for its services and is run as a business nonetheless. The evidence showed that in 2013, its services were rendered almost exclusively to paying customers. There was indeed evidentiary support for the ALJ's determination that "Midwest's charity on the property represents an incidental act of beneficence that is legally insufficient to establish that Midwest 'exclusively' uses the Marshak Pavilion for charitable purposes." And that rather than its exclusive purpose being to dispense charity, "Midwest's primary purpose is providing hospice and palliative care to patients who can pay for the care or who have insurance or access to government sources for payment."

¶ 39    The Department of Revenue did not clearly err by finding that Midwest failed to meet its burden of proof of showing by clear and convincing evidence that the hospice care pavilion was used for exclusively charitable purposes in 2013. Finding no clear error, we affirm the judgment of the circuit court and affirm the decision of the Department of Revenue denying Midwest's application for a property tax exemption for the Marshak Family Hospice Pavilion.

¶ 40                                III. CONCLUSION

¶ 41    Accordingly, we affirm.

¶ 42    Circuit court judgment affirmed. Department of Revenue determination affirmed.